Your Honor, this case is about to be dealt with at 0973 Duvall Cross. Attorney for Pellante, the Board of Trustees of Cattle Spring Firefighters Pension Fund. Defendant Pellante, arguing on behalf of the plaintiff, Pellante. Attorney for David Figlioli, arguing on behalf of the defendants, Pellante. Attorney, Mr. Carroll Cobb. Good morning, General. Good morning, Madam Attorney. Mr. Figlioli, are you prepared to proceed? Yes, ma'am. Thank you very much. Thank you. May it please the Court. Mr. Collins, again, my name is David Figlioli. I represent the appellant, Juana Crott, in this particular matter. It is our position that the decision from the pension board, in this case, is against the manifest way to the evidence and should be reversed. Our position is that the evidence presented in this case has established that Juana Crott's coronary artery disease, which is her disabling condition, was at least partially caused, or a contributing factor, was her job duties, her work activities during her fire service as a firefighter and paramedic for the village of Carroll Stream. As my brief points out, Juana Crott was a firefighter and paramedic for the village of Carroll Stream for at least 16 years, between 16 and 17 years. She wasn't just recently on the job. It was a significant period of time that she was in the fire service. She was hired in October of 1994, underwent a physical examination. As all firefighters who are hired by fire departments go through, there was no suggestion that she had been suffering from any coronary artery disease at that point in time. From 16 years at the time that she became a firefighter, during her physical, they saw nothing. That's correct. I noticed that some of the doctors, I can't recall which one I'm trying to figure out, but some of them had a distinction between a coronary artery disease versus coronary heart disease. Is there a difference? I don't believe there is a difference. I know there was some argument or some suggestion about are we dealing with like an infarct where there was a specific incident where there was damage to the heart tissue. That wasn't this particular case. I know there was an interplay between some terminology about atherosclerosis, which is coronary artery disease. Ultimately, she was suffering from coronary artery disease, whereby she had blockage in certain coronary vessels near her heart  and the placing of stents. Much has been made about her smoking, of course, and about her family history. That's correct. We are not taking the position that those other factors, and you identified some of those. She certainly had hypertension or high blood pressure. That was identified. She was overweight to some degree. The obesity certainly is a risk factor. Her cholesterol was high. She did have a smoking history in the past, although had given that up. There was some testimony about medications for her cholesterol level. That was fluctuating back and forth. Again, we are not saying that those risk factors aren't part of the reason why she developed the coronary artery disease. What we are saying in the position we are taking, and we believe the medical evidence establishes that, is that her fire service, and I'll get into that more specifically, that fire service was a contributing cause to the either development or progression of her coronary artery disease. So it could have hastened the progression. It could have hastened. It could have, along with all those preexisting non-occupational risk factors, been just as relevant to the development and progression of the coronary artery disease. And did any of the doctors, the three doctors, any of the three opine to that? Absolutely. I believe all three doctors, and I'll point that out, have ultimately said that aspects of her fire service, and again, that would be exposure to smoke, exposure to toxic chemicals, the stresses of the work shift, the hours, the exposures to cold temperatures or extreme temperatures, the anxiety, all of the exposures to the traumatic events and things of that nature were a factor in the development of the coronary artery disease. They're not saying that it is, again, the sole cause or the major cause. They're just saying, hey, she's got all these other non-occupational factors and she's got the other factors of occupational factors that contributed to the development and or progression of the coronary artery disease. Doesn't Dr. McDonough seem to say that, or his belief is that these things have to be the cause of? He seems to be the most specific or the most adamant on that position. Let me answer that question as well as your question, Your Honor. First of all, we have Dr. Moisan. We're dealing with three pension board doctors. There are no treating doctors' opinions in this case. We're dealing with the three pension board doctors. Dr. Moisan unequivocally completed a disability certificate. It's on page 291 of the record. And he was asked the following questions and then checked the box yes. The one question is, is the applicant's disability in the form of heart disease, stroke, tuberculosis, any disease of the lungs or respiratory tract, blah, blah, blah, which may be caused by exposure to heat, radiation, or a known carcinogen as defined by the International Agency for Research on Cancer? He checked the box yes. Is the disability resulting from service as a firefighter and or paramedic? He checked the box yes. So Moisan clearly says that is a factor. He said he couldn't exclude a contributing factor from her fire service. That is in his narrative report, and then he completed the disability certificate where he specifically said yes, it is part of the cause of her condition. Now, with respect to Dr. McDonough, you made a good point, and that would be my argument that I was going to present a little bit further on, but it's my belief that the pension board was misapplying the law when they looked at this case. Either they were looking at a different statute, which is pointed out in defendant's brief, where they're looking at the statute dealing with firefighters for municipalities over 500,000, and the language specifically in that statute, which is not found in the statute we're dealing with for firefighters in municipalities of lesser than 500,000 in population, that statute specifically has the language of you need to show that the condition arising solely out of the employment as a fireman. That is not a condition in section 4-110 or 110.1 of that pension statute that applies to Luana Crop. Now, with respect to Dr. McDonough, as you pointed out, interestingly enough, he was asked these questions when he was presented with, after he offered his opinion, no, I don't think it was caused by, then he was provided with his deposition testimony on another case, and it was a similar case dealing with smoking, coronary artery disease, things of the like nature, and he admitted, he said, well, wait a minute, the reason why he had two different opinions, in that case, they asked me this question, was it a contributing cause or factor? And he said, yes, it was. Now, the pension board in this case, he said, or he testified to, asked me a different question, and he characterized it as a black and white. This board asked him the question, was it the cause of her coronary artery disease? He certainly said, well, no, it's not the cause, and then in many occasions, and I can go through that in greater detail, he testified that it is a contributing cause or a cause. Now, the problem is, and this was kind of articulated by the judge in the circuit court, was that, well, you know, do you assign percentages, or do you assign weights or degrees of, okay, if I'm looking at this factor, this factor is 60%, and this factor is 30%. But did we review the trial court? No, I'm just presenting that as an argument where the judge had a little difficulty with grappling with that concept. My argument is the case law and the appellate courts have said that's never should be considered. We've never provided a bright-line test that says, well, you have to show that a factor, even though it may be a factor in causing or contributing or exacerbating a condition, a disabling condition, has to mean a certain level or a certain percentage if you're dealing with all these other factors. The reason for that clearly is it's a medical impossibility, as I think Dr. Nigen, I'll pronounce it Nigen, I'm not sure how to pronounce it, he specifically said, well, that's an impossibility, that's pure speculation. I can't say that, let's see, the obesity was 5%, then the high blood pressure was 10%, and the family history was 20%, then the smoking was 30%, and all the exposures in the fire service, the occupational exposures, well, that was only 2%. It's an impossibility. But didn't Nigen, did he consider the firefighter triggers? Didn't he at one point say, well, I didn't take that into consideration, the firefighting as a trigger to the heart disease? I don't recall he said he didn't consider it. He didn't have a lot of knowledge on that. So when he was presented with some of the studies and some of the things like that, Dr. Nigen certainly said in his testimony that I think it was a factor. It's certainly not a major factor. It certainly was a factor in the either development or progression of the coronary artery disease. Didn't he testify that based upon her clinical risk factors that she was at risk even if she was not a firefighter? I believe he testified to that. So, I mean, isn't that similar to Linda Mueller where the doctor said that the COPD would have been there whether it was a firefighter or not? Let me look at, Linda Mueller is where he had significant smoking history. Right, but that's what the doctors, all three doctors said that whether the plaintiff in that case was a cigarette smoker, or I'm sorry, whether that person was a fireman or not, he would have been in the same position with the COPD as he was at the time of the pension. Well, I believe that was the testimony, but I believe all of the doctors in Linda Mueller, unlike the doctors in this case, never wavered or offered opinions saying that the fire service was a factor. My reading of Linda Mueller as I looked at this is like Dr. Garrity found him disabled, but specifically said this disability did not result from active duty or cumulative effects of active duty. It was solely due to the excessive smoking over several years since age 16. Dr. Moisan, who's the doctor in this case as well, was the second board doctor, again, opined not duty related due to the cigarette smoking. Dr. McElligott, who's the third board doctor in Linda Mueller, opined that the condition was due to smoking. So we have actually, you can distinguish Linda Mueller because all three pension board doctors in that case unequivocally stated it was due to his long history of cigarette smoking. Now, he tried to bootstrap an argument saying, well, the legislature under the occupational diseases section of the pension code say, well, there's a presumption that if you're on the fire service more than five years, you're exposed to these toxic fumes and chemicals and things of that nature. But, again, the court in that case said, well, you can't just ignore the board doctor's opinions who are all saying it's due to your smoking and just go with that presumption. In other words, they rebutted that presumption. In this particular case, all three doctors are saying unequivocally that the fire service and her exposures, her anxiety, the risks, whatever the fire service exposures were, chemicals, smoke, the shift work, the diesel exhaust fumes, all of that exposure was a factor, although it could have been a factor. Are you saying Dr. Nguyen's testimony was unequivocal that fire service was a factor? Yes, I believe. I've read that testimony a number of times, and it seems like it's the most equivocal thing I've seen in a while. He goes back and forth and never comes out and actually says straight out that it was a factor. Well, on page 127 of the record, this is his testimony when they talk about, well, cigarette smoke has these chemicals and cigarette smoke certainly is a factor in developing coronary artery disease. Then he's provided with information about some studies that show what are the toxic chemicals in fire smoke and fumes. And then they ask him, well, if we have carbon monoxide, benzene, formaldehyde, hydrogen cyanide, and arsenic in the fire fumes, would you agree that those substances, separate or in combination, can also, just as cigarette smoke does, hasten the progression of coronary artery disease? His answer was, that's correct. These are the hypotheticals that the board spoke of and the studies that the board spoke of that this doctor was unfamiliar with. I mean, the board noted that, did it not? That a lot of his testimony, especially from this doctor, was based upon hypotheticals that, you know, arguably, your opponents are going to say didn't have proof in the record, and also based upon studies that this doctor had no knowledge of. I think he said without the knowledge, he couldn't rule it out. With the information that he was provided, I think he ultimately stated, I believe that the factors enumerated the exposures in fire service, they do change the epithelium in the veins, that causes a progression where they develop plaque, and ultimately the blockage. He does say there is, that is a factor. He said, I think, on a number of occasions, it may be a small factor. Certainly, all the other pre-existing non-occupational factors are probably far outweigh the exposure factors. Your client applied for a 110 and a 110.1 pension, correct? That is correct. You know, reading through this, I mean, I don't see a whole lot of discussion of acts of duty. I mean, are we pretty much looking at the 110.1 now as a result of fire service? We are, although when you read the language of 110, it says, or the cumulative effects of acts of duty. So I think you have that flexibility to argue either or, where if you could say, well, I remember going to a major fire in, you know, 2006 where we had to battle the blaze for four hours, or I remember being exposed to, you know, a diesel truck turning over on the highway. If you can point to specific acts and then the cumulative effects of that act, of the acts of duty, then arguably it's 110. Well, let me ask you this, though, because, I mean, the language that talks about exacerbating a condition and not being the cause but a cause, those all come out of the 110 cases, correct? They do, and I believe they come out of the 110.1 cases. You know, all of the cases we've cited in there, you can't really, when you read the cases, you're not really certain whether they've applied because they don't go into detail about whether they've applied, as you say, did they apply for a 110 or a 110.1. So I can't specifically point to a case like that. Well, counsel, in this brief, though, alludes to the fact that this may apply to 110, but it's not anywhere in the law in 110.1. And I would argue that there is no case that states that proposition, no case. He cites to, I don't know if it's Lindemann or the village of, what case is that, either Jensen or the village of Oak Park. And I've read that case over and over again. I don't see where that case stands for the proposition that 110.1 is a different standard than 110 because they both look to Section 112, which says you have to prove a disability. And I know of no case, and I've done the research that says that we differentiate between 110 and 110.1, where in 110, OK, you have to prove a factor. In 110.1, no, you have to prove it is the major factor or the only factor. And, again, I point out in the pension code for the Chicago firefighters, they have that specific language in there. And there are cases they talk about. And defendant, in his brief, cites to that particular case, I think it's Barrister or Barringer. And, again, that's inapplicable to this case. It's completely inapplicable. And there are a number of instances, again, Dr. Madonna pointed out they wanted information about, is this the major cause, is fire service the major cause of her coronary artery disease? And he said no. And, really, the focus should be, did the evidence prove that it was a contributing cause? And we believe it does. Thank you. Mr. Figlioli, thank you. You'll have another opportunity to address the court. Mr. Collins. I thank the court for this opportunity, Mr. Figlioli. Your Honor, this is a rather significant case insofar as it follows the Linda Muller case. It doesn't really. I mean, isn't Linda Muller a bit more extreme than this case? There are facts that are somewhat separate. In fact, one of the things I do want to point out is this is a manifest way to the evidence case. Being such, the question is whether or not the facts that the board used in reasoning its decision are facts which no reasonable person could come to an otherwise different conclusion. In this particular case, as I see it, we have Dr. Moysen saying, yes, it's a possible cause. Dr. Nguyen not ruling out causative factors. And Dr. McDonough saying, no, it's not the cause. So you have three different, although counsel thinks they're unequivocally in his favor, I see three different opinions. Do you disagree with that? I would have to say each answered the question in a different manner. But the answers are significantly the same. In fact, Dr. Moysen says, although this problem is generally considered related to underlying positions, I cannot exclude. That doesn't mean he ever said that it is. And the burden is upon the appellate. But he did check on that certificate, yes, Dr. Moysen. The box was checked yesterday. And the other two doctors don't check that box. Dr. Moysen did. So we have, as I said, now we've agreed on two because Dr. McDonough is, it has to be the cause. And so it's Dr. Nguyen in the middle.  So how is the board to take his position? Well, Dr. Nguyen says that the pre-existing conditions, such as obesity, hypertension, previous history of tobacco abuse, along with the problem of metabolic syndrome, did play a major part in carotid arteriosclerosis, heart disease, and development of a clastic arthroclytic disease, warranting the intervention with the stent. That was the purpose. That's what Dr. Nguyen said. He never did say that he believed that at any time, place, in fact, the record is completely absent anything that says that there was any type of exposure to smoke, cold, et cetera, by the appellant in this case, which may have caused or resulted in her disability. There's nothing here, Your Honor. And the burden, Your Honor, in Linda Mueller says that the burden falls to the appellant. Well, she testified to 10 to 12 fires per year, dumpster fires, which would have probably some issues, car fires, which would have issues, and car fires related both to the stresses that you see or the trauma that you see as well as the fumes coming from a car. So why do you say that there wasn't any evidence of some of these factors? There's no evidence of the fact that while she was fighting these fires, she had exposure at any time, she had any difficulty. There wasn't anything to indicate that this in any way actually created a situation where she began to have problems. Well, didn't she in fact take her own, did she give herself an EKG or something similar at one scene because she did not feel well and then she ended up going to the hospital? I believe that's in the record, Your Honor, that she did. What does that mean? Well, I don't believe that that was necessarily attributed to it, and there's nothing in the record that really said this was attributable to the fact that I was exposed to this. In fact, Your Honor, keep in mind that the people who work with her, who are with her when she does her job, when she was exposed, she came to so many fires, she did. The question is the person who goes in the fire first or the person who's the lead firefighter is usually the one exposed to the smoke. They're aware of that, Your Honor. They're aware of what Luana Crott did and what her service was. And the fact is that they did not believe that necessarily she was somebody who was one of the first ones in or at any time actually had any type of exposure to the smoke, et cetera, that would have brought on this type of disease. Because other people didn't get sick? See, I didn't watch Chicago Fire, Mr. Collins. I know everyone's exposed. I mean, because other people didn't get sick from these situations, how could she? Is that what you're saying? Quite frankly, that is something that I believe isn't – when you have firefighters sitting there, they put themselves in the place of the firefighter. They know the firefighter. They know what type of worker they are. Those are all factors that they take into consideration. In fact, that's one reason that the courts have said that you attribute more knowledge to those individuals because they're familiar with what firefighters do, what these individual firefighters do. And in this case, while she said yes, she was exposed, she went to 10, 15 fires. Someone can go to 10, 15 fires and actually stand by the truck, maintain the hose pressure. Somebody can go to the fire. Somebody can attend the fire. They can assign them to the paramedic ambulance. She was a paramedic firefighter or some other function. In this case, there was no evidence brought on her part where, yes, I was constantly exposed to all these different conditions that are in the preamble to the statute. Does it have to be constantly exposed? I don't believe you have to. There's evidence in the record from this firefighter that she went to these fires, that she was exposed to these things before she put on her SCBA, during car fires before that was required, in the overhaul after fires, the diesel fuels, the stress. I mean, she testified to many things that Mr. Linda Mulder never testified to. Mr. Linda Mulder really hung his hat on the diesel fuels in the firehouse and mold in the firehouse. Very, very little testimony regarding what he did at these fires. Seems to me there's a little more testimony here about that. Well, she had the same lawyer that Mr. Linda Mulder had, too. I don't know what the timing was of these two cases. But what I'm just saying, it seems like there's more, seems to be more testimony about her exposure. And if there's testimony as to exposure, I mean, unless you drop, you know, pass out at a scene from smoke inhalation, the preamble seems to kick in. And that is that we're going to take, the legislature's going to take note of the fact that these things happen, that this exposure, minimal amounts over a period of time, may have some effect on these firefighters. And I don't dispute that, Your Honor. In fact, I'm a strong advocate of this very statute, saying that it is a rebuttable presumption. But the rebuttable presumption is when you look at the other factors. In this case, when Ms. Kroc came on the department, it was noted that she had some very high-risk factors for the heart condition. When she had her physical? Pardon? When she had her physical? Yes. She had elevated cholesterol, I believe it was, and blood pressure, and constant, and every year when she was examined. Doesn't that play into her argument, though? And if you walk out of the job with these high risks, if in fact, I mean, a basic underlying question here is, do you agree that fire service has to be a cause or the cause? I believe that it should be the cause, Your Honor. If I had to advocate it, I think it's got to have more than just a scintilla of evidence that it is. These are two separate statutes. And the fact is this was created because of the fact that you have firefighters who fight fires for 30 years. Over a 30-year period, and after five years, that's why they have the five-year condition in there, because they want to make sure that you're actually out there in the fire services. You're exposed to this to a degree. That's why they have it. This is the only physical firefighters are required to have. The only physical any public safety officer is required to have prior to employment is for this specific reason to determine if there's heart risks, lung risks, or cancer. Why hire that person with heart risks? Because you're required to, Your Honor. In fact, going back to the Holmes case, which this court was involved in, the fact is that under the ADA, it was argued that you cannot deny someone employment if at that time they could actually perform the job. They changed the statute. They eliminated the initial physical for firefighters. So under 110, do you agree under 110, a cause is under the case law? A cause, not the cause, is the baseline. A cause. I think I have to concede that, although I think there's a little bit more to the occupational disease than there is to just the cause. The cause is you have to establish the fact. The issue still remains that under the Linda Miller cause, this court stated that it's the burden on the applicant to prove that. And in this case, the applicant did not prove it to the board. And we need to go back to the fact that whether or not the board was justified. It didn't prove what, though? A cause or the cause? A cause. Because the board, I mean, the board's findings at the very end talked about the cause. I mean, the board's stated, in the present case, none of the three physicians who examined the applicant found that fire service was the cause of the applicant's atheroclerotic heart disease. Well, that's word of art, Your Honor. Aren't those the tools? Nonetheless, when you're making a decision, it's not the causation. We're looking at the causation. There was not sufficient evidence to show there was a causation that was involved in performance of duties. That's what the board's determination was. And in future, Your Honor, when I write these decisions, I will say a cause. But the fact is that we still go back to the manifest weight of the evidence for the board and the board's decision. And the board's decision is one that they relied upon the information, the evidence. And one of these doctors came out and said unequivocally, this is what happened, this is where it is. In fact, a lot of these cases were actually these benefits are awarded. The only evidence the boards have to consider is articles, you know, hypotheticals, you know, percentages. Then what more did the board want her to prove? That she felt dizzy after a fire in 2002? Or they didn't believe that she did this EKG herself and then took herself to the hospital? They didn't believe that? I think the two things that are consistent between 110 and 110.1 is cumulatively. If over a cumulative period of time, if, for example, if she had established and said, when I first came on the department, I had no problem, I did this. After that, suddenly, as I was exposed to the fire, the heat, the cold, etc., you know, I began to, and I mentioned this to the doctor with my annual physicals, and the doctor said, well, you know, could this be it? Or is there stress? Should you reduce your stress level? The only thing the doctors told her is get your cholesterol down, lose weight, because you continue to gain weight, and the fact is take better care of yourself, improve your diet, your family history, everything works against you. They warned her. The department took those steps so that she could overcome these predispositions. These things, the reason we do the preexisting examination is so that we can screen out anyone who may have a predisposition to having a heart attack, stroke, or arterial blockage as this. They come in with their own causation. It's their lifestyle, and in this case, that's clearly what the board believed. They didn't believe that there was any proof which would prove the fact that there was a causation, a causation from the fire service. It's not, you can't exclude it. You can't exclude anything, practically speaking. When we use these terms, I mean, and that's one of the problems with the doctors. The doctors don't always say that, although clearly Dr. McDonough did, and that's cited in our brief. His comment, there is no evidence that the coronary artery disease from which she suffered was related to or caused by her service as a firefighter, but more likely related to her hypercholesterolemia. And that was Dr. McDonough. But, of course, Dr. McDonough is the doctor who was in the Lutzow case, said, oh, well, they didn't ask me this question. They asked me that question. And when I read that, it reminded me of my child when I actually caught him in a lie and said, well, you didn't ask me that question. You asked me this one. Well, you know, that's what children do. That's not what professionals do. What was the difference in the questions? Well, that I can't get into Dr. McDonough's mind. I really can't explain it. I do understand the point. And, Your Honor, Lutzow was the case I was involved in, and I was very familiar with it. But I think that was a different set of circumstances. Tom Lutzow died as a result of a heart attack in his garage, and he was a firefighter. In that case, the board felt that there was an absence of any of these predispositions we have before us here. Well, everybody has a family history, whatever that family history is. And some are good and some are bad. Unless you just poofed under the earth. But it's not just your family history. It's your personal history as well. And Ms. Crock has a very high-risk personal history, and it continued to get worse as time went by. She didn't gain weight because she was a firefighter. Her cholesterol didn't go up because she was a firefighter. Well, they eat well in Chicago. Well, they sure do. They eat well there in Charles Street too, Your Honor. But the fact is that that's one of the things they guard against. In fact, today I saw something with a firefighter from Bartlett who's an American ninja. So some take very, very good care of themselves. And that's one of the issues they had with Luana Crock. Because Luana Crock, during their history, during her employment, the firefighters knowing her, said she wasn't exposed to smoke. She wasn't exposed to all these other carcinogenics. We all were. None of us had problems. There was nothing that serious. In fact, if she didn't put on her SCBA equipment quick enough or with a car fire, none of us did. None of us had problems. They weren't that serious. They know each of these incidents, and they worked with her. So they excluded those from her history. You're saying the board did? The board has knowledge that others do not have. In fact, that's why. Where indifference is made towards their decision. And they get this knowledge from working themselves or other witnesses who testify? Well, they get this from working with her. A number of these firefighters worked on the shift at one time or another. They have three shifts. They moved amongst the shifts. One of the members, Perry Johnson, is deputy chief, and he worked all the way through. And they all knew her. They knew about her firefighting skills, et cetera. And they also were aware of how she treated herself, how she handled herself physically. Firefighters are provided all sorts of exercise equipment. You go into a firehouse, sometimes it looks like a gym. And the thing is, if you use it, you exercise, you're supposed to keep yourself in good physical condition. In this case, this is not what we had. We had somebody predisposed towards problems medically, and she did nothing to really improve it. All that happened is it continued to deteriorate. And that's what it is. We have a deterioration of her medical condition. A family history. All those factors came in. Those were the factors that caused the CAD, coronary artery disease. I know we use the abbreviation ACAD. Mr. Collins, thank you so much for your time. Thank you. Mr. Figlioli. Thank you. Again, as Justice Burke pointed out, I have a problem, and I believe this court has a problem, with when you read the decision of the pension board, to me it appears that they are trying to see whether there is a specific incident that led to a collapse, let's say, of Luana Kropp. And I point out in their decisions a number of citations. On page 12 of the decision, the board says the applicant has not overcome the requirement that her heart condition was a result of fire duties. The applicant's testimony points to no specific occasion where a factor in her on-duty responsibilities was causally related to her present heart condition. On page 13, the board cites to Dr. Nygan's opinion that the applicant's condition is a progressive disease, neurohormonal chemical cascade, which causes the plaque buildup. It is not caused by the rigorous activities of firefighting. Again, we're not arguing that. We're not arguing as she was lifting a patient, or she was in a fire, and she all of a sudden had pain in her chest and couldn't breathe. Not B, but A. Yes. We're saying that, again, it is a progressive disease. And Mr. Collins testifies that, well, she had all these other factors. But again, she also had the additional factors of exposure to smoke, exposure to toxic chemicals, exposure to stress, exposure to diesel exhaust. And the doctors say we think the non-occupationals are the major cause, but we can't rule out and we think that maybe another cause, or at least a part or factor, is the occupational exposures, and that's what the law says is enough to establish the burden. The occupational hazards, I think one of them said, could have hastened this issue. That's correct. Again, I guess the anatomy or the kinesiology or whatever it is, the endothelia, which is the lining of the blood vessels, they become brittle. And again, exposure to toxic chemicals, stresses. That's why people have heart attacks, because of the brittleness, the stresses that constricts the blood vessels. That contributes to the brittleness of the endothelium, and it's a progression over time. I'm not saying that her obesity or her smoking or her family history or anything else also are factors over a progression period of time. But she was also a firefighter paramedic for over 16 years. My argument is that those exposures are also factors that need to be considered, and they are a causal factor. To sit here and say, well, other firemen had those same exposures, and as of 2010 or 2011, 95% of the department didn't have coronary artery disease. Number one, they don't test for it. Number two, that's not the burden to show that, well, everybody else didn't get it and you got it, so that means it's not work-related. It's not due to occupational exposures. Again, she had risks, risk factors, non-occupational. She had exposures in her occupation. The combination of both probably accelerated the progression of the coronary artery disease. And the doctors did say, yeah, that's true. It would progress it. It would cause it. They're not saying it's the cause, as Justice Hutchinson points out. It's a cause, and that's what the statute allows. And I don't believe there is a difference between 110 and 110.1. Again, Mr. Collins argues, well, the members of the board, well, they work with her. She didn't have these exposures. She was able to use her self-contained breathing apparatus. She didn't have this or that. But, again, you go back to the legislative presumption that more than five years of service, there's a presumption that there are these exposures. There's no doubt there were exposures. What about the training exercises? What about the overhaul sessions where, after a fire, they're in there making sure that there's not fire in the walls? They don't have their self-contained breathing apparatus on. They're walking around throwing furniture out. They're exposed to the smoke. They're exposed to the toxic chemicals. What about that? Are those? Is there a line, though, in that a decision in your client's favor based on these facts, would that not open the door to every person who served over five years as a firefighter with any type of plaque buildup in their arteries would then say, hey, I've been to a few fires, and I've got plaque buildup, so here we go. I get an occupational disease disability. Well, interestingly enough, there are firefighters who have plaque buildup, who have stents, that continue to work. That is not a, under the NFPA, it is not a condition that precludes a firefighter from working. It's to the point where if that blockage is significant and they have symptoms related to that when they're performing their strenuous activities, even though they don't suffer a myocardial infarction as of yet, the doctors would say, you know, I think it's a risk that you will, you need to go out on disability. Nobody disagrees that she is disabled. Correct. But no, I don't think it opens the door to floodgates or the slippery slope that everyone is going to apply for because, you know, not everyone develops the coronary artery disease. As Mr. Collins said, there's a ninja warrior, you know, firefighter, there's this and that. Another one of my favorite shows. So you can't say it's going to open the door. I believe you look at every case and the facts of that particular case, and you can't say, well, these people didn't get it, so she can't get it, or she developed this condition, but nobody else did, so it can't be related to fire service. Thank you. Thank you, Mr. Figueroa and Mr. Collins. Thank you so much for your time, gentlemen, and your brilliant arguments. We will take this case under consideration and render a decision in due course. Thank you very much. Safe travels back here.